IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

AUDREY A. MARSHALL                                              PLAINTIFF

V.                                  NO. 11-5007

MICHAEL J. ASTRUE,
Commissioner of the Social Security Administration              DEFENDANT

**MEMORANDUM OPINION**

Plaintiff, Audrey A. Marshall, brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of a decision of the Commissioner of the Social Security Administration (Commissioner) denying her claims for a period of disability and disability insurance benefits (DIB) under the provisions of Title II of the Social Security Act (Act). In this judicial review, the Court must determine whether there is substantial evidence in the administrative record to support the Commissioner's decision. See 42 U.S.C. § 405(g).

**I.   Procedural Background:**

Plaintiff protectively filed her current application for DIB on February 15, 2008, alleging an inability to work since January 7, 2003,[1] due to a cerebral aneurysm, memory loss, panic and anxiety attacks, loss of vision and hearing and balance, and a low functioning kidney. (Tr. 68, 147, 151). For DIB purposes, Plaintiff maintained insured status through December 31, 2006. (Tr. 147). An administrative hearing was held on May 19, 2009, at which Plaintiff appeared with

---

[1] Although Plaintiff's attorney stated at the hearing that he was amending his onset date to December 31, 2006, the date last insured, the ALJ adjudicated Plaintiff's disability claim from January 7, 2003 through December 31, 2006. In any event, there is no dispute that Plaintiff had to establish disability on or before December 31, 2006, and the Court has reviewed and considered all of the documents contained in the record, including documents dated before January 7, 2003, and after December 31, 2006.

counsel and testified. (Tr. 10-62).

By written decision dated November 24, 2009, the ALJ found Plaintiff was not disabled at any time from January 7, 2003 through December 31, 2006. (Tr. 75). The ALJ found that through the date last insured, the Plaintiff had the following severe impairments - cerebral aneurysm and hypertension. (Tr. 70). However, after reviewing all of the evidence presented, he determined that Plaintiff's impairments did not meet or equal the level of severity of any impairment listed in the Listing of Impairments found in Appendix I, Subpart P, Regulation No. 4. (Tr. 72). The ALJ found that, through the date last insured, Plaintiff retained the residual functional capacity (RFC) to:

> occasionally lift/carry twenty pounds and frequently lift/carry ten pounds, sit for six hours in an eight hour workday, and stand/walk for six hours in an eight hour workday. Additionally, she could frequently climb, balance, crawl, stoop, kneel, and crouch.

(Tr. 72). With the help of a vocational expert (VE), the ALJ determined that through the date last insured, Plaintiff was unable to perform any past relevant work. (Tr. 74). However, the ALJ also found that there were other jobs in the national economy that Plaintiff would have been able to perform, such as egg grader, cashier II, fast food worker, and poultry line worker. (Tr. 75).

Plaintiff then requested a review of the hearing decision by the Appeals Council, which denied that request on November 23, 2010. (Tr. 104). On that same date, the Appeals Council issued an order, allowing the Plaintiff to supplement the record with medical assessments and evaluations dated November 4, 2009 and July 28, 2010. (Tr. 5). In the Notice of Appeals Council Action, the Appeals Council specifically addressed the additional documents as follows:

> In looking at your case, we considered the additional evidence listed on the enclosed Order of Appeals Council. In particular, we have considered the medical assessment dated February 11, 2010 by Richard Back, Ph.D., which indicated that the claimant had

> marked restrictions interacting with the public, co-workers and supervision and that your restrictions existed as of 2003. (Exhibit 23F). However, your application is for a Period of Disability and Disability Insurance Benefits with a remote date last insured of December 31, 2006. Therefore, your disability must have occurred on or before December 31, 2006. Although Dr. Back indicated that your condition had existed as of 2003, a review of the objective medical evidence on or before December 2006 does not support his assessment. None of the medical records on or before December 2006 shows that you had marked restrictions interacting with the public, co-workers and supervision. Moreover, a progress report in April of 2003 showed that, although you had some memory loss on occasion, forgetfulness and headaches, you were "doing quite well" overall (Exhibit 2F). Similarly progress reports in 2004 through 2006 consistently show that your recent and remote memory were normal and judgment and insight intact (Exhibit 4F).
>
> As a result, we found that this information does not provide a basis for changing the Administrative Law Judge's decision.

(Tr. 2). Subsequently, Plaintiff filed this action. (Doc. 1). This case is before the undersigned pursuant to the consent of the parties. (Doc.5). Both parties have filed briefs, and the case is now ready for decision. (Docs. 8, 13).

## II.     Evidence Presented:

Plaintiff was born in 1961 and worked from 1984 to 2001 as a shell egg and poultry grader, Regulatory Officer and Field Inspector for Arkansas Livestock and Poultry Commission. (Tr. 139). She completed the sixth grade in school and received her GED. (Tr. 156). In 2000 and 2001, Plaintiff had surgery on her right hand and left hand, respectively, for her carpal tunnel syndrome. (Tr. 372, 378). On January 7, 2003, Plaintiff presented herself to Northwest Medical Center, complaining of high blood pressure and headache pressure, thinking she was having a stroke. (Tr. 320-322). She was found to have a subarachnoid and intraventricular hemorrhage, "most suggestive of a bleeding aneurysm." (Tr. 327). Plaintiff was admitted to the hospital, and

AO72A
(Rev. 8/82)

on January 14, 2003, a Left Pterional[2] craniotomy and clipping of bilobed anterior communicating artery aneurysm was performed by Dr. J. Charles Mace. (Tr. 203, 468). Plaintiff was discharged from the hospital on January 24, 2003. (Tr. 199).

On January 28, 2003, Plaintiff presented herself to her treating physician, Dr. Robert T. Wilson, Jr., of Northwest Family Care - Westside, for follow up for her hypertension. (Tr. 266-267). At that time, Dr. Wilson increased her Lotrel. (Tr. 267).

On February 5, 2003, Plaintiff followed up with her surgeon, Dr. Mace, stating that she continued to have some headaches on occasion as well as some dizziness and forgetfulness. (Tr. 221, 466). Dr. Mace reported that overall, "I think she is doing quite well with the expected consequences of subarachnoid hemorrhage particularly with an anterior communicating artery aneurysm." (Tr. 221). On an April 2, 2003 follow up visit with Dr. Mace, Plaintiff reported she was having no headaches, and her head CT showed no evidence of hydrocephalus and minimal extra-axial fluid collection that seemed to be improving. (Tr. 220). It was reported that her arteriogram showed complete resolution of the aneurysm, and no other aneurysms. (Tr. 220). Dr. Mace again opined that Plaintiff was doing quite well, noting that there had been some memory loss on occasion, forgetfulness, and even occasional headaches. (Tr. 220). However, he reported that it looked as though the aneurysm was completely obliterated, and no further aneurysms were present. (Tr. 220).

On June 29, 2004, Plaintiff presented herself to Dr. Wilson for follow up regarding her hypertension. (Tr. 264). Dr. Wilson reported Plaintiff as doing well on Wellbutrin. (Tr. 264).

---

[2]Pterion - A point at the junction of the frontal, parietal, temporal, and greater wing of the sphenoid bone; about 3 cm posterior to the external angular process of the orbit. <u>Dorland's Illustrated Medical Dictionary</u> 1574 (31st ed. 2007).

Plaintiff made one visit to Dr. Wilson in 2005 and two visits in 2006, complaining of chest pain and insomnia, respectively. (Tr. 255-261). At the 2005 visit, Dr. Wilson assessed Plaintiff with:

> GERD - Gastroesophageal reflux
> Muscle tension headache
> Hypertension
> Depression
> Anxiety syndrome
> Status post right nephrectomy
> Trace ankle edema
> Obesity

(Tr. 261).

At a visit to Dr. Wilson on March 17, 2006, he assessed Plaintiff with:

> Anxiety syndrome
> Depression
> Insomnia
> Hypertension, essential

(Tr. 259).

On July 24, 2006, Dr. Wilson assessed Plaintiff with:

> Hypertension
> Depression
> Anxiety syndrome
> Status post right nephrectomy
> Obesity

(Tr. 256).

On February 9, 2007, Dr. Wilson reported that with respect to Plaintiff's anxiety, Plaintiff's medication adequately controlled or improved it and no panic attacks were reported. (Tr. 253). In his report, Dr. Wilson assessed Plaintiff with:

> Bilateral otitis media

-5-

      Headache, migraine
      Muscle tension headache
      Carpal tunnel syndrome
      Hypertension
      Depression
      Anxiety syndrome (tense or nervous)
      Status post right nephrectomy
      Trace ankle edema
      Obesity

(Tr. 254). On August 7, 2007, with respect to Plaintiff's depression, Plaintiff reported she was taking her medication regularly with no reported suicidal thinking. (Tr. 250). Dr. Wilson assessed Plaintiff with:

      Headache, migraine
      Muscle tension headache
      Carpal Tunnel syndrome (wrist/hand pain or numbness)
      Hypertension (high blood pressure)
      Hypercholesterolemia, without high triglycerides (elevated blood cholesterol)
      Depression
      Anxiety syndrome (tense of nervous)
      Status post right nephrectomy
      Trace ankle edema
      Obesity

(Tr. 252).

On January 3, 2008, Dr. Wilson reported that Plaintiff's anxiety was adequately controlled or improved, and that no panic attacks were reported. (Tr. 248). He also noted that Plaintiff was taking her medication for depression regularly and that her mood was adequately controlled or improved, with no suicidal thinking. (Tr. 248). Dr. Wilson assessed Plaintiff with:

      Acute Sinusitis
      Hypertension (high blood pressure)
      Renal insufficiency
      Hypercholesterolemia,[3] without high triglycerides (elevated blood cholesterol)

---

[3] Hypercholesterolemia - Excessive cholesterol in the blood. Id. at 899.

(Tr. 250). At that same time, Plaintiff was also seeing Dr. Avin D. Rekhi at the Fayetteville Diagnostic Clinic for issues relating to her solitary kidney functioning. (Tr. 223-225). Dr. Rekhi found that it was more likely that Plaintiff had mild hypertensive nephrosclerosis[4] and/or some amount of effect from her ACE inhibitor resulting in a decreased GFR (Glomerular Filtration Rate). (Tr. 224).

Plaintiff was seen by Dr. Richard McWhorter, of Ozark Urology, for urinary incontinence, on January 22, 2008, and on February 18, 2008, saw Dr. Britte D. Smith, from Northwest Arkansas Clinic for Women. (Tr. 293-294, 298). On February 26, 2008, Dr. Smith performed a laparoscopic-assisted vaginal hysterectomy and left salpingo-oophorectomy, and Dr. McWhorter performed a SPARC vaginal sling, anterior repair with Pelvicol patch, and sacrospinous fixation of vaginal cuff prolapse. (Tr. 306, 312).

On March 21, 2008, Plaintiff was seen at the Northwest Family Care Clinic to have her lipids rechecked. She was assessed with depression, anxiety syndrome, and hypercholesterolemia, without high triglycerides. The doctor changed her Xanax to Clonazepam. (Tr. 423). On March 31, 2008, Dr. McWhorter reported that Plaintiff was having no incontinence and felt great. (Tr. 291).

On April 9, 2008, Dr. Wilson assessed Plaintiff with edema, peripheral (swelling or fluid) and obesity. (Tr. 247). On June 23, 2008, Dr. Wilson saw Plaintiff for refills on her Xanax and Flexeril, and Plaintiff wanted to discuss changing her blood pressure medications. (Tr. 432)

In 2008, Plaintiff also had her vision and hearing tested, and it was reported that she needed glasses, and had some hearing loss in both ears. (Tr. 180, 411). Also in 2008, Plaintiff

---

[4]Nephrosclerosis - Sclerosis or hardening of the kidney, usually due to renovascular disease. Id. at 1262.

sought treatment for knee pain by Dr. Mark W. Powell. (Tr. 382). X-rays of the right knee revealed joint spaces were well maintained, and a MRI of her right knee revealed "right knee patellofemoral chondromalacia, right knee questionable medial and lateral meniscal tears, right knee questionable loose bodies." (Tr. 384). Plaintiff wished to proceed with surgery, and on August 8, 2008, Dr. Powell performed a right knee arthroscopy. (Tr. 386). A followup of her right knee on September 23, 2008, revealed her portals were well healed. (Tr. 392).

On May 13, 2008, Dr. Bill F. Payne completed a Physical RFC Assessment. (Tr. 351-358). Dr. Payne found that Plaintiff could:

> occasionally lift and/or carry (including upward pulling) 20 pounds; frequently lift and/or carry (including upward pulling) 10 pounds; stand and/or walk (with normal breaks) for a total of about 6 hours in an 8-hour workday; sit (with normal breaks) for a total of about 6 hours in an 8-hour workday; push and/or pull (including operation of hand and/or foot controls) unlimited, other than as shown for lift and/or carry.

(Tr. 352). Dr. Payne also found that no postural, manipulative, visual, communicative or environmental limitations were established. (Tr. 353-355). He made the following additional comments:

> The claimant had rt nephrectomy in 1985. Current evidence shows normal remaining left kidney. She has [sic] an aneurysm in 2003 and underwent craniotomy. There was complete resolution. She has been treated for hypertension with no significant complications. Prior and at 12/31/06, DLI she had RFC for light work.

(Tr. 358).

On April 23, 2009, Plaintiff presented herself to Dr. Wilson to discuss her depression medications. She stated that she had a hysterectomy one year prior and might need hormones. She reported that for one or two weeks every month she would be depressed. (Tr. 447). Dr. Wilson found that Plaintiff was not a candidate for estrogen therapy with the previous vascular

-8-

disease and hypertension, and increased her Wellbutrin. (Tr. 448).

On November 4, 2009, Plaintiff was seen by Richard Back, Ph.D. of Northwest Arkansas Psychological Group. (Tr. 484-485, 488-489, 514-515). Dr. Back diagnosed Plaintiff with:

| | |
|---|---|
| Axis I: | Panic Disorder without Agoraphobia |
| | Major Depression, Single Episode, Moderate |
| Axis II: | No Diagnosis on Axis II |

(Tr. 485). Subsequent to the ALJ's unfavorable decision dated November 24, 2009, Dr. Back conducted a Mental Diagnostic and Intellectual Evaluation on February 11, 2010. (Tr. 498-504, 524-530). Among other things, Dr. Back concluded that Plaintiff's mental impairments interfered with her day to day adaptive functioning to a marked extent; that Plaintiff's capacity to communicate and interact in a socially adequate manner was markedly impaired; that Plaintiff's capacity to communicate in an intelligible and effective manner was mildly impaired; that Plaintiff's capacity to cope with typical mental/cognitive demands of basic work-like tasks appeared to be only mildly impaired; that Plaintiff's ability to attend and sustain concentration on basic tasks was only mildly impaired; that Plaintiff's capacity to sustain persistence in completing tasks was very good; and that Plaintiff's capacity to complete work-like tasks within an acceptable time frame was very moderately impaired. (Tr. 503). He assessed Plaintiff as follows:

| | |
|---|---|
| Axis I: | Social Phobia |
| | Generalized Anxiety Disorder |
| | Vascular Dementia |
| Axis II: | No Diagnosis on Axis II |
| Axis V: | 45-55 |

(Tr. 502-503). Also on February 11, 2010, Dr. Back completed a Medical Source Statement of Ability to do Work-Related Activities (Mental). (Tr. 505-507, 510-512). In the form, Dr. Back

found that Plaintiff was "Marked" in her ability to interact appropriately with the public, supervisor(s), and co-workers. (Tr. 506). Dr. Back also opined that "[t]hese limitations were first present in 2003 after her aneurysm." (Tr. 506).

In her April 21, 2008 report of Pain and Other Symptoms, Plaintiff reported that she felt "shattered, I feel like half the person I once was, I have no confidence left in myself and fear anything new!" (Tr. 130). In her Function Report dated April 21, 2008, Plaintiff reported that she prepared breakfast for her children, helped them to pick what to wear to school, reminded them to take their homework to school, drove them to school, cleaned up the kitchen, did at least one load of laundry, picked the children up from school, prepared supper, tried to help her husband bathe the children and get them ready for bed, and took her medications her husband laid out for her. She reported that she cared for her three children -loved them, fed them, and played with them. (Tr. 131). She also reported that she fed the cat and changed the litter box. (Tr. 132). She noted that her husband helped her with most all of the household cleaning, grocery shopping and paid the bills. (Tr. 132).

### III.    Applicable Law:

This Court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole. Ramirez v. Barnhart, 292 F. 3d 576, 583 (8th Cir. 2002). Substantial evidence is less than a preponderance but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision. The ALJ's decision must be affirmed if the record contains substantial evidence to support it. Edwards v. Barnhart, 314 F. 3d 964, 966 (8th Cir. 2003). As long as there is substantial evidence in the record that supports the Commissioner's decision, the Court may not reverse it simply because substantial evidence

exists in the record that would have supported a contrary outcome, or because the Court would have decided the case differently. Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001). In other words, if after reviewing the record, it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, the decision of the ALJ must be affirmed. Young v. Apfel, 221 F. 3d 1065, 1068 (8th Cir. 2000).

It is well established that a claimant for Social Security disability benefits has the burden of proving her disability by establishing a physical or mental disability that has lasted at least one year and that prevents her from engaging in any substantial gainful activity. Pearsall v. Massanari, 274 F. 3d 1211, 1217 (8th Cir. 2001); see also 42 U.S.C. §§423(d)(1)(A), 1382c(a)(3)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§423(d)(3), 1382(3)(D). A Plaintiff must show that her disability, not simply her impairment, has lasted for at least twelve consecutive months.

The Commissioner's regulations require him to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant had engaged in substantial gainful activity since filing her claim; (2) whether the claimant had a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) met or equaled an impairment in the listings; (4) whether the impairment(s) prevented the claimant from doing past relevant work; and (5) whether the claimant was able to perform other work in the national economy given her age, education, and experience. See 20 C.F.R. §416.920. Only if the final stage is reached does the fact finder consider the Plaintiff's age, education, and work experience

in light of her residual functional capacity (RFC). See McCoy v. Schneider, 683 F.2d 1138, 1141-42 (8th Cir. 1982); 20 C.F.R. §416.920.

## IV. Discussion:

In her appeal brief, Plaintiff argues that the ALJ erred by failing to order the psychological CE/RFC as requested by Plaintiff's counsel. Second, Plaintiff argues that when Plaintiff was finally evaluated psychologically, clear and unequivocal evidence emerged not only as to the severity of Plaintiff's impairments but also as to the onset of her mental limitations. See SSR 83-20. She argues that this new and material evidence, when considered with Plaintiff's testimony and Dr. Wilson's records, reflects unequivocally that Plaintiff was disabled well before December 31, 2006.

### A. Mental Impairment:

Plaintiff seems to argue that Plaintiff's mental impairments were severe, and that the ALJ failed to fully develop the record in this regard. An impairment is severe within the meaning of the regulations if it significantly limits an individual's ability to perform basic work activities. 20 C.F.R. § § 1520(a)(4)ii), 416.920(a)(4)(ii). An impairment or combination of impairments is not severe when medical and other evidence establish only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on an individual's ability to work. 20 C.F.R. § § 404.1521, 416.921. The Supreme Court has adopted a "de minimis standard" with regard to the severity standard. Hudson v. Bowen, 870 F.2d 1392, 1395 (8th Cir. 1989).

In the present case, the ALJ found that Plaintiff's medically determinable mental impairments of depression and anxiety did not cause more than minimal limitation in her ability

to perform basic mental work activities and were therefore non-severe.  In making this determination, the ALJ addressed the four broad functional areas set out in the disability regulations for evaluating mental disorders and in section 12.00C of the Listing of Impairments. He found that Plaintiff had only mild limitation in activities of daily living; mild limitation in social functioning; mild limitation in concentration, persistence or pace;  and experienced no episodes of decompensation.

The ALJ discussed Plaintiff's cerebral aneurysm and the subsequent symptoms of which Plaintiff complained.  He noted that between 2003 and her date last insured, Plaintiff complained to her treating physician of occasional headaches, but made no other complaints related to residuals of her aneurysm or the resultant surgery.  The ALJ concluded that the fact that Plaintiff did not seek treatment of or in fact mention any of these complaints to her treating physician was inconsistent with an allegation of severe and disabling symptoms.  During the relevant time period, after Plaintiff's cerebral aneurysm surgery, Dr. Mace found Plaintiff to be doing quite well, and had a discussion with Plaintiff about some memory loss on occasion, forgetfulness, and even occasional headaches.  He concluded that the aneurysm was completely obliterated, and no further aneurysms were present.  Plaintiff saw Dr. Wilson only two times in 2004, and these visits were for followup of her hypertension.  It was noted, however, at the June 29, 2004 visit that Plaintiff needed a refill for Wellbutrin for her depression, and that Plaintiff "does well on the medication."  Plaintiff saw Dr. Wilson only one time in 2005, on August 12, 2005, and Plaintiff's chief complaint was chest pain, with a tingling in her left arm.  Although she reported that she was having headaches at that time, Plaintiff thought it because she was "nervous from the kids. Behind eyes is where the headache starts and stays."  In early 2007, Dr. Wilson noted

that the medication for plaintiff's anxiety was adequately controlling or improving her anxiety problem, with no panic attacks reported. In mid 2007, Dr. Wilson noted that Plaintiff was taking her depression medication regularly and there was no reported suicidal thinking. Although Dr. Wilson continuously diagnosed Plaintiff with depression, this was one of many diagnoses that was listed as ongoing, active problems. As late as January 3, 2008, one year after the date last insured, Dr. Wilson reported that Plaintiff's anxiety and depression were adequately controlled or improved. The fact that Plaintiff's depression and anxiety were controlled with medication supports the ALJ's finding that Plaintiff's mental impairments were non-severe. Gates v. Astrue, 627 F.3d 1080, 1082 (8th Cir. 2010)(holding that fact that medical record supported the conclusion that any depression experienced by the claimant was situational in nature, related to marital issues, and improved with a regimen of medication and counseling supported finding that the claimant's depression and anxiety were not severe).

### B.    Subjective Complaints and Credibility Analysis:

The ALJ was required to consider all the evidence relating to Plaintiff's subjective complaints including evidence presented by third parties that relates to: (1) Plaintiff's daily activities; (2) the duration, frequency, and intensity of her pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of her medication; and (5) functional restrictions. See Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). While an ALJ may not discount a claimant's subjective complaints solely because the medical evidence fails to support them, an ALJ may discount those complaints where inconsistencies appear in the record as a whole. Id. As the Eighth Circuit has observed, "Our touchstone is that [a claimant's] credibility is primarily a matter for the ALJ to decide." Edwards v. Barnhart, 314 F.3d 964, 966 (8th Cir.

2003).

There is no indication that during the relevant time period, Plaintiff had severe difficulties in her activities of daily living. In fact, as late as April 21, 2008, well after the date last insured, Plaintiff was able to care for three children, prepare their breakfast, take them to school, clean up the kitchen, do laundry, prepare supper, help her husband bathe the children and get them ready for bed. The ALJ acknowledged that the medical evidence of record indicated that subsequent to Plaintiff's date last insured, Plaintiff's condition had worsened. However, during the relevant time period, there is no indication that Plaintiff was unable to do the activities described above. Furthermore, as noted earlier, it appears that during the relevant time period, Plaintiff regularly took her medication, and her depression and anxiety appeared to be favorably responding to the medication. As noted by the Defendant, in virtually every examination of Plaintiff by Dr. Wilson, although she was diagnosed with depression and anxiety, she took medication regularly without side-effects, and her symptoms were improved and stable on medication. One deviation was on August 12, 2005, when Plaintiff reported she believed she was having headaches because she was nervous from the children.

The Court believes there is substantial evidence in the record to support the ALJ's credibility findings.

### C. Residual Functional Capacity Assessment:

The Court next turns to the ALJ's assessment of Plaintiff's RFC. RFC is the most a person can do despite that person's limitations. 20 C.F.R. §404.1545(a)(1). It is assessed using all relevant evidence in the record. Id. This includes medical records, observations of treating physicians and others, and the claimant's own description of her limitations. Guilliams, 393 F.3d

at 801; Eichelberger v. Barnhart, 390 F.3d 584, 591 (8th Cir. 2004). Limitations resulting from symptoms such as pain are also factored into the assessment. 20 C.F.R. § 404.1545(a)(3). The Eighth Circuit has held that a "claimant's residual functional capacity is a medical question." Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001). Therefore, an ALJ's determination concerning a claimant's RFC must be supported by medical evidence that addresses the claimant's ability to function in the workplace." Lewis v. Barnhart, 353 F.3d 642, 646 (8th Cir. 2003). "The ALJ is [also] required to set forth specifically a claimant's limitations and to determine how those limitations affect his RFC." Id.

As stated earlier, the ALJ found Plaintiff retained the RFC to perform light work, with certain limitations. Plaintiff argues that the ALJ erred by not obtaining a psychological evaluation of Plaintiff before rendering a decision. Alternatively, Plaintiff argues that Dr. Back's February 11, 2010 evaluation and medical source statement constitute new and additional evidence, and that had the ALJ had them before him, he may have reached a different outcome. When the Appeals Council has considered material new evidence and nonetheless declined review, the ALJ's decision becomes the final action of the Commissioner. The Court then has no jurisdiction to review the Appeals Council's action because it is a nonfinal agency action. See Browning v. Sullivan, 958 F.2d 817, 822 (8th Cir.1992). At this point, the Court's task is only to decide whether the ALJ's decision is supported by substantial evidence in the record as a whole, including the new evidence made part of the record by the Appeals Council that was not before the ALJ. As the United States Court of Appeals for the Eighth Circuit has noted, "this [is] a peculiar task for a reviewing court." Riley v. Shalala, 18 F.3d 619, 622 (8th Cir.1994). However, once it is clear that the Appeals Council considered the new evidence, then the Court

-16-

must factor in the evidence and determine whether the ALJ's decision is still supported by substantial evidence. This requires the Court to speculate on how the ALJ would have weighed the newly submitted evidence had it been available at the initial hearing. <u>Flynn v. Chater</u>, 107 F.3d 617, 621 (8th Cir.1997).

There is no question that Dr. Back found Plaintiff to have "marked" limitations in her ability to interact appropriately with the public, supervisor(s), and with co-workers, that her ability in processing speed was affected by the impairment, and he also opined that these limitations were first present in 2003 after her aneurysm. However, after considering the entire record as a whole, and factoring in the new evidence, the Court does not believe there is substantial evidence to support Dr. Back's claim of significant mental impairment during the relevant period. As noted by the Appeals Council, none of the medical records on or before December 2006 shows that Plaintiff had marked restrictions interacting with the public, co-workers and supervision. In addition, in a progress report dated April 2, 2003 by Dr. Mace, it was reported that although Plaintiff had some memory loss on occasion, forgetfulness and headaches, Plaintiff was "doing quite well" overall. Similarly, progress reports in 2004 through 2006 consistently show that Plaintiff's recent and remote memory were normal and judgment and insight intact. Finally, Dr. Payne's Physical RFC Assessment indicates that he believed that Plaintiff was capable of performing light work, and he found no postural, manipulative, visual, communicative or environmental limitations were established. Dr. Payne noted that Plaintiff had a right nephrectomy in 1985, that current evidence showed normal remaining left kidney, that Plaintiff had an aneurysm in 2003 and underwent a craniotomy, and that there was complete resolution. He also noted that Plaintiff had been treated for hypertension with no significant

complications. He concluded that "Prior and at 12/31/2006, DLI she had RFC for light work."

The Court also notes that at the May 19, 2009 hearing, Plaintiff testified that she noticed "here in the last year or two that the depression is getting worse." (Tr. 47). Clearly, even Plaintiff stated that her depression did not become worse until after the date last insured. The Court does not believe the outcome would have been any different had the ALJ had Dr. Back's 2010 evaluation and statement before him, in light of the record as a whole, and finds that there is substantial evidence to support the ALJ's RFC assessment.

### D. Hypothetical Question to the VE:

In the first hypothetical question posed to the VE, the ALJ asked him to assume a hypothetical person a younger individual, with a high school education and the same work history as the claimant. He further stated:

> This person can occasionally lift/carry 20 pounds and frequently 10. She can sit for 6 hours in a day and can stand/walk for 6 hours. She can frequently climb, balance, crawl, stoop, kneel, and crouch. Could this person return to the identified past work, either as performed by the claimant to as commonly performed as described in the work history document?

The VE answered "Yes" according to DOT, but "No" according to her written job description of lifting 25 to 50 pounds frequently and 50 pounds as heaviest lifted.

The ALJ then asked the VE to assume no past relevant work to which the person could return. He then wanted to know if there were jobs in the national and regional economy this person could do. The VE answered that the jobs of egg grader - light unskilled, cashier II; fast food worker; and poultry line worker would be available.

The Court believes the hypotheticals the ALJ proposed to the VE fully set forth the impairments which the ALJ accepted as true and which were supported by the record as a whole.

See Goff v. Barnhart, 421 F.3d 785, 794 (8th Cir. 2005). The Court further believes that the VE's responses to these hypothetical questions constitute substantial evidence supporting the ALJ's conclusion that Plaintiff's impairments did not preclude her from performing work as an egg grader, cashier II, fast food worker, and poultry line worker, during the relevant time period. Pickney v. Chater, 96 F.3d 294, 296 (8th Cir. 1996)(testimony from VE based on properly phrased hypothetical question constitutes substantial evidence).

**V.   Conclusion:**

Accordingly, the Court recommends affirming the ALJ's decision and dismissing Plaintiff's case with prejudice.

DATED this 16th day of February, 2012.

/s/ *Erin L. Setser*
HON. ERIN L. SETSER
UNITED STATES MAGISTRATE JUDGE